May it please the Court, David Frederick of Lionel Sawyer & Collins on behalf of Appellant Michael Racusin. The issue in this case is whether Mr. Racusin's money judgment for American Wagering's refusal to pay compensation in the form of stock for services rendered must be subordinated to AWI's preferred shareholders and other creditors under Section 510B of the Bankruptcy Code. Now, Section 510B implements what is referred to as the absolute priority rule in bankruptcy, and that simply stated is that equity investors, those who have the opportunity to share in the debtor's gains, must bear the greater risk of loss by having their claims subordinated to creditors seeking recovery of fixed debts. Now, I would submit today, and I hope to be able to discuss with the Court, that the absolute priority rule that is implemented by Section 510B carries with it at least four corollaries that distinguish this case from this Court's Betacom decision, which is the centerpiece of AWI's briefing, and also the recently decided Enron case, which I expect to be central to their arguments. And the first of those reasons is the fact that, and it almost seems too elementary to say, but that the claim to be subordinated must be in the nature of the risk return claim of a shareholder. And what I mean by that is simply this. If you are going to say that the claims of investors, those in the position to take the risk or not take the risk of gains in the debtor, those are going to be subordinated, then you have to have that kind of a claim. You have to have a claim from somebody who has that kind of investment choice. What happened here, of course, is that AWI breached the agreement between the parties by not tendering the stock to Mr. Rackeson and deprived him of not only the benefits of stock ownership that we know about, but also the benefits of the unique opportunity to participate in the IPO. Now, in Betacom, this Court said you don't need a physical delivery of stock, but what you did have was a tender of stock that was refused by the complaining party. And Enron involves employee stock options, and the Court made it very clear those options were unexercised, but they could have been exercised. The point here is the opportunity for investor choice. The control of that opportunity, in this case, was kept by AWI. They never tendered the stock. They never made it available. Indeed, at the beginning, at the portion after the IPO, when AWI's stock was on the rise and stayed at a high level, they took the position they didn't even owe him stock. What they owed him was a portion of the proceeds of the IPO calculated by reference to stock. Then, of course, when the stock dropped, they flipped over to the other side of the equation, and you have what they now say. Mr. Rackeson has only an equity claim to stock, and because he only has an equity claim to stock, we can subordinate him. So the first important point to recognize here is they want to insist that Mr. Rackeson be treated as a shareholder when he had neither the benefits of the shareholder or the investment choice that is the very rationale for subordination, and all of that due to their own wrongful conduct. Now, the second corollary of the absolute priority rule is that the nature of the claim that is asserted has to be the variable risk return claim of an investor, not the fixed claim of a creditor. And we know that from the Montgomery Ward case, the Mobile Tool case, and the discussion of those cases in subsequent decisions, including Enron, which make it clear that if you have a shareholder who exchanges their risk return position for a fixed debt obligation on the part of the debtor, and then seeks to enforce that fixed debt obligation, that claim is not subordinated. What happens here is by virtue of this Court's prior decision in 2001, that's exactly what Mr. Rackeson did. He brought a claim for money damages based upon the value of AWI's performance when he was supposed to receive it, at the conclusion of the IPO on May 15th, 1996. He brought that money claim from the very outset when they didn't deliver the claim. Could I ask you this question? If you're right, what will be the recovery here, more or less? The amount of the judgment, as I understand it, is $2.3 million, right? That is the amount of the judgment. I do not have the interest calculations that would go with that in front of me. That's another appeal that's been decided by this Court. But it would be that number plus interest. And that would be the monetary recovery to which the decision in this Court applies. What is the bankrupt estate working at pay? Do you know? With Court's permission, I'll refer that to the Debtors' Counsel, because I'm hesitant to make statements about the bankruptcy proceedings that may not be current, frankly, at the moment. Now, one thing in respect to your question, of course, is that the subordination argument that is being made here is subordination not only to creditors, but to preferred stockholders. And it's their position that there would be nothing due in owing in those circumstances. But in our circumstances, there would be the monetary judgment. Now, the importance of that conversion feature that I talked about that is recognized in the cases is what derives from this Court's earlier decision. This is not the first time that American Wagering has attempted to foist stock on Mr. Rackerson after the stock price has fallen and in spite of the monetary judgment. When you make an agreement that your services are going to be compensated for by $150,000 and a certain amount of stock, isn't that what the person is entitled to? No, for this reason. Very small change, but very significant in the wording of the agreement. The agreement was $150,000 in cash and a specific valuation paid in the form of stock. The difference in that is why. The difference is why when we get to that valuation, and we've had two jury verdicts, determining that valuation. Is that what the original agreement specified? Or it is, say, 4.5% interest of the stock? No. No, the original agreement specifically used the terminology in the form of stock. The operative wording, it's a tab 2 of the excerpts of record in which after reciting services, et cetera, the agreement provides as compensation, he would be paid 4.5% of the final evaluation in the form of Leroy's common stock and $150,000 in cash upon completion of the common offering or IPO. So if it's to be in the form of stock, why isn't that what it's supposed to be? That's exactly the issue that was resolved in the 2001 decision of this Court. That was the very argument that was made by AWI was the Court's decision below was correct because the agreement said pay it in the form of stock, to which this Court said no. Mr. Rackeson brought a claim for money damages for breach of the agreement. That's what he's entitled to recover. And that's why it's important to go back to the nature of the claim. What the BAP did in this case is to literally say the world stops turning the moment the agreement is made. At that point in time, it doesn't matter what kind of a claim is brought. It has to be by, as a matter of law, an equity claim and it has to be subordinated. Well, when you look at MobileTool, when you look at the Montgomery Ward case, and when you look at Betacom and Enron, even Enron itself, that just simply isn't true. What you look at is the nature of the claim that is brought under the events as they transpire. And here the reality is, because of the fact that the IPO occurred at a specific point in time, under specific market conditions, you could not be fully compensated by a specific performance decree that would give you market-traded stock much, much later after the market conditions have changed and after Mr. Rackeson has lost the unique advantages and potential detriments of the IPO. This is a unique market condition that cannot be effectively remedied by a specific performance decree, and that's the very reason he brought a microcredit. He signed this contract, the agreement. He also was banking on the idea or the notion that what he might get upon final evaluation was significantly more than what he would have gotten if they had just paid him a set price at the time he began his work. Isn't that correct? Well, when you say significantly more than when, it was always, this agreement was entered into always with reference to the underwriter's final evaluation. He was willing to take under all this work to help them issue their stock offering. Right. Apparently he was skilled at this or knowledgeable and knew how to do it. And rather than bargaining for a set price for his work, he took, he was willing to take the risk that, you know, at the end, what he might get for his work would be substantially greater than he would have been paid just in a dollar amount at the very beginning. When you say take the risk, you mean by taking the stock and holding it? No, by getting paid in stock. But only if he either, you know, profited one way or another. And that's the point of Judge Hugg's question when he talked about, you know, in the form of stock. He gets the stock based upon a valuation at one point in time. Now, you're right. If he holds the stock, it may go up, it may go down. That would be a risk-return position if the No. And what he was bargaining for was a circumstance that would give him the risk-return position with a certain amount of cash. Now, he never got that. And that's the whole point of this exercise. Is he never got the choices. He never got control of that risk-return position. And it certainly is perfectly appropriate to say in circumstances like Betacom where somebody has the choice, the stock is there, it's tendered, and they turn it down, you have the risk-return opportunity that leads to subordination. But if the stock is never tendered, you don't have that opportunity for gain or loss that you're referring to. If in a hypothetical situation, suppose that there is this agreement where he agrees to take the stock in the form, his compensation in the form of stock and an additional amount and all of a sudden he can see the stock price has gone down and he then chooses in the first instance, without all this other litigation, he just chooses well, I'd rather have the money and so I'd rather have what the value of the stock was when it very first was issued. Now, can he do that? Or is that subordinated? Can he just choose I want to receive the money instead of the stock because the stock has gone down the tubes? Those are two different questions, whether it's subordinated and can he do it. Go back to the agreement. It talks about a certain percentage of the final evaluation. And nobody has ever quarreled with that valuation date. That's the damages he gets. So that the situation, can he do it? The part of the agreement you just read, it didn't say evaluation date as of a certain time. It just said he received his compensation in the form of stock, I thought. Right, but it says upon completion of the common offering or IPO, and it's not disputed, that was May 15th, 1996. So it doesn't specify a date in the agreement, but it references an event that did occur on a specific date. That that was his compensation was based upon what the value of the stock was on that date? The value of the underwriter's evaluation, not the value of the stock, but the value of the underwriter's evaluation. And then this Court directed how that was to be determined. But that's, yeah, that was the measure of his damages. Let me ask you, I realize your time is running, but I have one other question for you. So your claim all hinges on the idea that his claim was reduced to a judgment, right? A debt. But as I understand the briefs, I'm reading the briefs, you both agreed essentially that you could look through the judgment to this underlying transaction. Is that correct? The problem with the phraseology about looking through the judgment. Well, you look down to what this was all about, what the predicate for the judgment was. I think where we would disagree is whether you look, when you look through the judgment, you look at the underlying transaction or you look at the nature of the claim. Yes, you can look through the judgment, but I think that's where I would disagree with AWI. Okay. I think you look through the judgment to see the nature of the underlying claim because the statute talks about subordination claims. Counsel, let me ask you this. Give me again the date of the completion of the common offering. May 15th, 1996. And was he had a right then, if that had, if he had received the stock, then he had a right to immediately sell or to hold in his discretion? With limitations. He was an insider? No, he wasn't an insider. The problem is the Rule 144 restricted stock, which means he could have sold it in a private sale, all of it at once, and in the evaluation trial, this became a matter of testimony. Well, that was all right. Or he could have sold it after a period of time in certain amounts. That was all litigated in the trial, and as a result of that, the money damages was established after that happened. That is correct. And that's final judgment? Yes. With the Court's permission, I'd like to report. Yes. May it please the Court. My name is Thomas Fell. I represent the Debtors' AWI and Leroy's Horse and Sports Place. The issues have been stated quite correctly. This case is a case about priority. And that's all. Priority of a claim filed in a bankruptcy proceeding. Not whether or not the claim is to be paid in cash, paid in stock, or whatnot. It's about the priority of a claim. The treatment of a claim is contingent upon how a plan that is ultimately confirmed in a case provides for a particular class of claimants or equity security holders. So the issue is, where does this claim fall within that scheme in the Bankruptcy Code? This Court wisely issued the Betacom decision, which every court since that time has cited to with approval. It recognized the priority structure under the Bankruptcy Code and the mandatory subordination required by 510B when a claim arises out of the purchase and sale of security. There's no dispute in this case, none whatsoever, that under the agreement, Mr. Rackeson was allowed to receive stock for compensation in addition to $150,000 in cash that he received. The only element of his claim is what is left under that agreement, which is the stock that was never issued to him. But there's no dispute it was to be issued. The parties all acknowledge that this case, the only thing about the underlying case was about damages for the failure of AWI to issue stock to Mr. Rackeson, damages for failure to issue. Yes, Mr. Rackeson reduced it to judgment. Now, what was the reason they refused to issue? Your Honor, the reason why they refused to issue is because AWI asserted that the contract itself was unenforceable. I see. But that was decided against them. That was decided against them. Correct, Your Honor. Now, once the Court determined that ---- There is a distinction with Betacom in that, in Betacom, the shares were tendered. They were in escrow and offered, that's correct, and the parties refused them given where they were. Shares were refused. Were never offered, were never tendered to him. That's correct. That's correct. But again ---- Do you think that's irrelevant? I do, Your Honor. Let me tell you why. That ---- it's true in Betacom that shares were tendered. But by the time they were tendered, the parties were already in litigation, and thus the parties didn't agree to accept those shares. There are multiple claims of breach back and forth. Take Enron, however, for example. Enron dealt with employee plans whereby employees were to receive options as part of their compensation package. Those options they did not receive and were unable to exercise them as a result of the intervening bankruptcy. One of the claimants, which they did, asked Enron to issue stock to that employee who acquired the stock through his employee plan. And in fact, when the employee inquired of the company, where's my stock, Enron said, here ---- the Court references the letter, said we're not going to issue it to you. It's true ---- it's true that this plaintiff was willing to take the risk of receiving the equity in the corporation. But also, isn't it true that he, if he had received the equity and the contract had not been breached, he would have had the option of when to sell? That's correct. As counsel explained. He could have then reduced his equity substantially prior to the bankruptcy. He could have reduced his equity to money damages or, I mean, to money at that point in time if there had been no breach of contract. So he took a risk, but a part of the risk he took was a choice of when to sell. That choice of when to sell was denied to him. Sure. It was, Your Honor. He could have ridden it up or he could have ridden it down. And that, we'll never know how that would have played out and what would have happened. Or he could have sold it right then. Subject to the restrictions, as counsel referenced. It was not necessarily immediately available. I'm sorry, Your Honor. That was all thrashed out in the trial of the case, right? That's correct. That's correct. And he was awarded money damages for the failure of AWI to issue that stock when he was entitled to have it issued. Okay? So, again, what we look at when we look below the judgment ---- And your position of the debtor in that first litigation was that he was entitled only to money damages, wasn't it? Your Honor, there's ---- it's taken very much out of context, the one page in the record on appeal that's in there. When you read it, what the issue was that was being argued about, I think it was in a motion for summary judgment, actually, and I was not trial counsel at the time. But the question that was being fought over was whether or not he was entitled to 4.5 percent of the $45 million or 4.5 percent of the portion of the company that was sold. The whole company wasn't sold at $45 million. The company only sold a portion of itself. But it was over money damages, and that was your ---- It was. It was over money damages. And, in fact, the original ---- the original judgment ---- Yes, $700,000. Was awarded and paid. And it was only after Mr. Rackerson appealed that judgment that things started changing. Again, as to the treatment of the claim in the bankruptcy, what was fought over and what was sought is not the relevant question. The relevant question is, is, but for AWI's failure to issue stock to Mr. Rackerson, would Mr. Rackerson have a claim today in AWI's bankruptcy estate? And if the answer is no, then 510B mandates subordination of his claim. That's the causal nexus that every case, including Betacom and every case thereafter discusses. It's the nexus. But you're saying that if the contract had been complied with, what he would have today is the stock. Or nothing. He may have sold it, as Your Honor said. He may have sold all the stock. He may not be here. He could have. Or he could have stock. At least insofar as the judgment in the court ---- the district court is concerned, he would have had X2 million-some-odd dollars if he had sold it, right? That's correct. That's the judgment. If he had sold it. If he had sold it, as of the date it was valued at the IPO. What is the doctrine here that you rely on to say that we must look upon this as though there was no money judgment in the case and look behind the money judgment to the original transaction and then say that he would have retained the stock? What is this subordination, some kind of equitable doctrine of subordination? I don't understand the theory exactly that would require him, despite the money judgment in the district court, for us to assume that he still is an equitable owner of the stock. I'm sure, Your Honor. And, again, almost every case that has dealt with 510B subordination ---- almost. Not all. Almost. Almost every one of those cases, you have a situation where it has already entered into litigation and a judgment has been entered. And the reason is pretty obvious in a lot of those situations. One party or both parties reaches an agreement or fails to perform. There may be financial difficulties going on. Somebody runs the courthouse. Somebody gets a judgment. But if they get a judgment before the bankruptcy, the courts have stated there should be no distinction between whether or not ---- What is the theory? What is the legal theory? It's the analysis that was set forth by this Court in Betacom. It's the risk analysis that someone who is bargaining for an equity position in a company is accepting. But there it was tendered. Here ---- and he refused to take the tender in that case. In this case, it was never tendered. So he ---- although he assumed in the beginning to take the risk as an equitable investor, he also assumed that he would receive the stock and could choose whatever he wanted to do with the stock. Correct. Once he received it under certain restrictions. He was ---- he didn't get the second choice, which is a part of the transaction. So that's why I'm saying, what is your theory that you would say he took a risk on the front end, but when there was a breach of contract, he didn't have the right on the back end to sell? He assumed the risk, but he assumed the right or received the right. He didn't get that right. But that's true in every one of the 510B cases where judgments were entered. It's just a race to the courthouse steps. In other words, what you're saying, Your Honor, is had we filed Chapter 11 prior to the entry of the judgment, then that question wouldn't be relevant. The petition date should not be relevant to the analysis. The analysis is he bargained for ---- his consideration was the issuance of AWI stock. What he would have done or ultimately not done with that stock becomes irrelevant. The fact is, that's what he bargained for. He bargained to have an equity position. He didn't get the benefit of his bargain. I agree with that. But the bottom line is, that's what he was looking for. Had the stock been issued, he'd have no claim in the bankruptcy court today. Is that an Enron and Betacon that you're allowing? I'm sorry? Are there other cases besides the Ninth Circuit case and the Enron case that have had a situation where the ---- there was a contract for stock, and ---- but the stock was not ever tendered, and there was a breach of contract, and it was reduced to judgment? Has there ever been a case like that? Your Honor, there have been a number of the cases that were cited in our briefs that almost every one had been reduced to judgment. For example, the Altecast case was reduced to judgment. In fact, in that case, it was where the company refused to purchase back the stock under the employment agreement. And the jury returned a verdict for damages because, again, at that point in time, when the stock hadn't been purchased, the breach of contract action was for damages, just as it was here, and it was a jury verdict for damages. That was all done prepetition. In the Third Circuit case ---- The bankruptcy case, or a court ---- Bankruptcy. That's Bankruptcy, Delaware. That was Altecast? Altecast, correct. Okay. Is any court of appeals case, anything other than a bankruptcy case ---- The Telegroup case, which is the Third Circuit Court of Appeals, that was in a breach of an agreement to register, to use your best efforts to register shares. Again, that court focused on the absolute priority rule issue, and the fixed dollar versus the variable profit that an investor hopes to achieve, just like the ---- That claim hadn't been reduced to judgment. I'm sorry? Had that claim been reduced to judgment in Telegroup? Your Honor, I don't have that note directly in front of me. I don't recall that. I don't recall specifically if that one had been reduced to judgment or not. Isn't there a distinction in the Betacom case where they refused to accept the stock after the litigation? I'm sure it was, in that case, it was tendered, and they wouldn't take it. This case, it was never tendered. Your Honor, you have to be careful when you ask that. I believe that was ---- Oh, I'll try to be as careful as I can. No, I'm sorry. I'm not disrespecting tender. What I mean by that is when we say that the stock was offered or tendered, when you look at Betacom, the stock was tendered after the allegations and the fighting began between the parties and the litigation commenced. And thus, the stock was tendered, and they said, now we don't want it. And because, of course, it becomes ---- it's common sense at that point in time. Once the share prices start going down, people don't want the stock any longer. And in all the cases where they have sued, they haven't sued. None of the cases have they sued for the stock. They've always sued for monetary damages, because by the time a company gets to the door of bankruptcy, the shares may not be worth what they once were. Well, that's true, but at least it was tendered, and in this case it was never tendered. Fair enough. That's correct, Your Honor. That is absolutely correct. Careful enough? No, Justice Breyer. Let me ask you this, just as a practical matter. What's the size of the bankruptcy estate if you have a $2.3 million judgment? What percent of the bankrupt estate is that going to? Your Honor, I realize we're going outside the record, and I realize the opposing counsel could not answer the question regarding the status of the bankruptcy estate. This case was brought, as many of these cases are, long before plans ever proposed. At the time that this case was brought, we had no idea what was going to be paid to unsecured creditors or what was going to be paid to equity, if anything. I am the bankruptcy counsel for this estate, and I can tell you, subsequent in time to the cross motions for summary judgment and the original ruling by the bankruptcy court, after that time, a plan, in fact, was proposed. The treatment under the plan for unsecured creditors and for equity interest is different. However, because of a separate resolution with Mr. Rackerson, the treat – his treatment is governed pursuant to a confirmed plan of reorganization. And that is between – that was on a deal that was approved by the bankruptcy court through the plan. So what your – what your role is here today is only to determine what priority class Mr. Rackerson falls into, whether he falls into an unsecured creditor or he falls into the level of equity. Understand – This plan has been reduced to a judgment now? It's confirmed. It's confirmed. It's effective. So we can take – we can take judicial notice of what the bankruptcy court has done here. Absolutely. It's not – I mean, it dehorses the record, but we can take judicial notice of it. Actually, the thing – So what would be – what does it say about this guy here? Mr. Rackerson, if the decision of the bankruptcy appellate panel is with – is upheld, Mr. Rackerson will be treated along with all of the common shareholders and will receive the exact same thing that common shareholders is, which is shares in the reorganized entity. Okay? That's what he receives if the bankruptcy appellate panel is upheld. If it is not, and Mr. Rackerson is treated as an unsecured creditor, he is not paid with the other unsecured creditors. Due to provisions in the plan, there is a payment schedule that he'll receive payments over time. Now, have all the secured creditors going to get paid? All secured creditors have been paid. All unsecured creditors have now been paid. Priorities – For shares. By shares. No. By cash. Unsecured creditors have been paid, except for Mr. — Have been paid in full as of today. I see. Again, at the time the case was filed, you don't know those things, how it's going to play out in any bankruptcy. If Mr. Rackerson prevails here, he would be treated as an unsecured creditor, but he has a special clause that would allow him to be paid over time. Correct. That's correct. But in shares, in the new – Reorganized company. In the reorganized company. Undiluted. Undiluted. I see. Okay. Again, it's not an issue as to how his claim will be paid, because that was resolved outside of court. But if we affirm the BAP, then he doesn't get anything, basically. No. No. That's incorrect, Your Honor. He gets exactly what all the other common shareholders got, new shares in the reorganized company, publicly traded on the stock. He receives shares in reorganized AWI. I'm not – I didn't follow entirely what you said. Under that – under the clause, if he is – if he's treated as an unsecured creditor. Right. He doesn't get shares. He will receive payments over time. Cash. Money. Over time. Over time. And right now, the shares have already been issued to Mr. Rackerson. They've been interpled with the bankruptcy court because there are competing claims to them by various creditors of him. So they've already been issued and interpled. They're sitting in the bankruptcy court pending the decision of this court. But again, let's not be sidetracked by what the plan ultimately provided for. This is an issue over the priority statement of the bankruptcy code and where particular claims fall. Again, as we stated in our pleading, it was never an intent to do anything to modify or affect Mr. Rackerson's claim. Much has been made about the fact that this court previously said, well, Mr. Rackerson only sued for damages, thus he should be awarded a monetary judgment as opposed to specific performance. No argument there. And we weren't saying his claim of $2.3 million should be disallowed. We never said it should be disallowed. His claim for $2.3 million exists and has always existed in the bankruptcy statement. Counsel, plaintiff must think that the cash is going to be considerably better than getting the shares in the reorganized company, right? I think a lot of it has to do with accrued interest, Your Honor. But again, the claim is what it is. It exists. The only question under 510B is where, as in any other priority statute under the bankruptcy It's all about priority. It's all about priority, not treatment. It's only about priority. Treatment is affected separately by a plan. Unless, Your Honor, you have anything further, thank you. Thank you. I'm going to begin with a qualification. And I'm going to state this in very general terms. And that is, the debtor's counsel has gone outside the record with respect to the status of the plan and the treatment, et cetera. I am not going to here today either agree or disagree with him, other than to say that I'll accept his representation. There has been a confirmed plan. However, that doesn't necessarily mean, because of other agreements which he referred to as, quote, unquote, outside of court, that necessarily matters have been fully resolved. But let me go directly to your question about what's the theory here? What are we doing with subordination? Counsel says it's only about priority. But the point of the priority here is to subordinate investment loss claims behind fixed creditor claims. And all of the cases he referred to are cases that, in fact, deal with investment losses. That simply is not the nature of the claim that we are dealing with here. Mr. Rackeson's claim has nothing to do with whether the stock price went up or went down. Yes, it was measured by the stock price on a particular day. That was the measure of damages. But it was not the kind of risk return claim that is, or should be, subject to subordination. Let me talk for just a moment about the discussion in Enron of Phantom Stock, which counsel referred to. The problem there was, yes, there was a failure to deliver a claim, but it was a failure to deliver the value in question, because the failure to deliver the stock was a part of the plan, the compensation plan for tax purposes. So it simply is not the same kind of a claim that we have here at this point. The key point I would like to leave with the Court is this. Subordination has to do with investment loss claims. This is a claim for compensation. The agreement said pay compensation in the form of stock. The debtor breached that agreement. The compensation claim is not an investment loss claim. And you look to the nature of the claim to decide subordination. Thank you. The matter will be submitted. And we'll be in recess until tomorrow. The recourse of this session is adjourned.
judges: Hug, Merritt , Paez